## MONTGOMERY AMUSEMENT CO. v. MONTGOMERY TRACTION CO.

(Circuit Court, M. D. Alabama. July 12, 1905.)

1. INJUNCTION—TRESPASS.

Where a street railway's entry into complainant's park was lawful if properly made, and became unlawful only because it was alleged that the entry was by force at the hands of one from whom the possession was wrongfully withheld, a court of equity, in the absence of irreparable injury from the mode of entry and occupation, would not protect the possession of one wrongfully seeking to withhold it, by injunction, but would leave such complainant to redress the forcible trespass by ordinary remedies.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 98, 100.]

2. LEASES—RESERVATIONS—EXERCISE OF POWER.

Where a lease of land for park purposes reserved to the grantor the right to grant a right of way through the park for street railway purposes, mere acquiescence by the lessors in a prior entry of a street railway company into the park at the instance of the lessees, and its use of a part of the premises as a station for receiving and delivering passengers, did not constitute an exercise of the power reserved.

3. SAME—CONSTRUCTION—STREET RAILWAYS—CHARACTER.

An electric railway, operating beyond the limits of a city, and into a town incorporated for the mere maintenance of a park adjacent to the city, was a street railway, within a power reserved in the lease of the land used for the park, reserving to the lessors the right to grant a right of way through the land "for street railway purposes."

4. STATUTES—CONSTITUTION—MANDATORY PROVISIONS—INTRODUCTORY CLAUSE.

Const. Ala. § 45, providing that the style of laws of the state shall be, "Be it enacted by the Legislature of Alabama," is mandatory.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Statutes, § 44.]

5. SAME—COMPLIANCE.

Under Const. Ala. § 45, providing that the style of laws of the state shall be, "Be it enacted by the Legislature of Alabama," Act March 20, 1903 (Acts 1903, p. 116), amending Code, § 1283, the enacting clause of which stated that it was enacted by "the Legislature of Alabama," was not defective because it also declared that "the Legislature of Alabama" which enacted the statute was "the Legislature of the state of Alabama."

139 F.—23

6. STREET RAILROADS—AMENDMENT OF CHARTER—STATUTES—APPLICATION.

Where a street railway company was in existence prior to the passage of Act Ala. Oct. 2, 1903, p. 336, section 47 of which provides a method for alteration and amendment of street railway charters, and was therefore authorized to make alterations in its charter, and to change its lines and their termini as provided by Act March 20, 1903 (Acts 1903, p. 116), amending Code, § 1283, the corporation's right thereunder was saved from the effect of the later act by a clause thereof that nothing therein should be so construed as to affect the rights, etc., of any corporation now existing, and chartered under the general or special laws of the state.

7. SAME—RIGHT OF WAY—CONVEYANCE TO RAILWAY.

Where a town was incorporated merely for park purposes, had never been platted, was without streets, and its entire territory had been surrendered to a private corporation, it was nevertheless a town which might be legally made the terminus of a street railway; and, the building of such railway into the town not being ultra vires, the railway had a right to acquire a right of way over private property within the town by purchase or lease from the owners, regardless of whether it had power to condemn a right of way over property in the town.

8. LEASES—RESERVATION—CONSTRUCTION.

Where a lease of land for park purposes reserved to the lessors a power to grant a right of way by deed or grant through any part of the leased premises for street railway purposes, the lessors were only entitled, after the improvement of the park, to grant a right of way to a railway company at such a location as would not unreasonably interfere with the arrangement of the park.

9. INJUNCTION—ASSIGNMENT OF LEASE—RIGHTS OF ASSIGNOR—DEFENSES.

It is no defense to a bill for an injunction by an amusement company against an unreasonable and forcible entry by a traction company in a park of which the amusement company was in possession under a lease from a street railway company, which also had a terminus at the park, that the amusement company is the mere instrument of the railway company, and is insisting on its complaint in order to further the interest of the railway company against a rival in the passenger business at the park. Having the undoubted right to complain of an unreasonable entry and interference with its business, the motive of the amusement company in insisting upon its rights presents no ground which authorizes a court to deny them because their enforcement may give one of the rival street railways an advantage over the other in getting passengers.

## In Equity.

This case is submitted on bill, answer, and affidavits on motion for a preliminary injunction. The bill is filed by the Montgomery Amusement Company, a citizen of Georgia, against the Montgomery Traction Company, a domestic corporation, to enjoin the defendant from constructing and using a street railway in a private park used by complainant as a pleasure ground for white persons only, in what is known as the "Town of Bloemfontaine." The rights of the parties arose in this wise: On the 28th of February, 1901, the Legislature incorporated the town of Bloemfontaine. The territory included in its limits had at that time one or two inhabitants, and consisted entirely of marshes and swamps, with the exception of a few adjoining acres of wooded lands. The town has never been platted. No streets have been designated or laid out, and the woods, save as altered for park purposes, remain as before the incorporation of the town. The act conferred the usual municipal powers upon the town council. The incorporation was in anticipation of the use of the property as a park, to give better police protection to those who might resort to it, and with a view to securing local authorities who would be liberal in the execution of the laws regarding amusements expected to be carried on there. On June 10, 1902, Walker and wife, who owned all the lands in the town, leased them to Francis E. Ayers for park purposes and as a pleasure resort for the term of 20 years. The lands thus leased consist of a body of about 80 acres, distant about three miles from the City of Montgomery, adjoining the Line

Creek or Mt. Meigs Road, and lay in the midst of other lands owned by the Walkers, which bound the leased premises on two sides. The only roads then leading to the property were the ordinary county roads. The lease stipulated that Ayers might cut certain descriptions of timber, and should pay for the use of the premises an annual rental of $405; that at the end of the lease the buildings erected were to revert to the Walkers; and that the property was to be put to no other use than a pleasure ground and park. The Walkers reserved the right to enter the premises to take away dead timber, and also to remove the timber cut down by Ayers, and, in event the rent was not paid, the right to re-enter the premises to take possession. The last clause in the indenture stated: "Nothing in this lease shall be so construed as to prevent the parties of the first part from granting a right of way by deed or lease, through any part of the leased lands for street railway purposes." In the year 1903 the Montgomery Street Railway Company acquired Ayers' interest in the lease. On the 16th of May, 1904, Walker and wife signed a writing which, after stating the transfer of the lease, agreed that the street railway company might cut such timber as might be necessary for a driveway and walk and the erection of buildings and places of amusement. On the 11th day of May, 1904, the street railway company let the premises for a period of 10 years, with the privilege of renewal of the lease 10 years more, to the amusement company, which entered upon the lands, fenced off some 10 acres of it, beautified it as a park, laid out walks and flower beds, erected waterworks, laid water mains, lighted the grounds with electricity, erected pavilions and other buildings, and made a lake by digging out the marsh and damming a stream which ran through it; expending large sums of money, amounting in all to about $50,000. On the 8th day of May, 1905, Walker and wife, for a valuable consideration, made a conveyance of a right of way 30 feet wide to the Montgomery Traction Company into the leased lands; describing the route upon which that company constructed its street railway. The deed recited that Walker and wife had given the traction company authority to take immediate possession of the described right of way, and that they had reserved the right to grant such right of way in the lease to Ayers. Thereupon that company entered upon the right of way and proceeded to build a street railway thereon. The bill alleges that the defendant entered forcibly and without right, selecting a route which led into the heart of the park, over parts of it which complainant had beautified and adorned, and constructed its railway in a space much used by the crowds who resort to the park, skirting between the buildings and artificial lake made upon the premises, in such manner as to be destructive of complainant's control over the business and the management of the park, and dangerous to the lives of its patrons, etc. The answer set up, among other things, an estoppel on the part of the amusement company, in consequence of what had taken place at the conference between the officers of the two companies as to letting the traction company into the park. The court received affidavits on this point. The substance of these affidavits, as well as the surrounding circumstances at the time the lease was entered into, are set out in the opinion.

Steiner, Crum & Weil and Gunter & Gunter, for complainant.
Massey Wilson and Rushton & Coleman, for respondent.

JONES, District Judge. This case has been ably and elaborately argued. The facts, save as to the estoppel, are without dispute, and of many things not explicitly stated in the record a court sitting in this locality may well take judicial notice. The amusement company assails the right of the traction company to enter upon the leased premises on various grounds, which have been grouped under appropriate heads for convenience of discussion.

1. Estoppel. If the amusement company is estopped, as claimed in the answer, to object to the entry of the traction company, that ends this case. On a preliminary motion, in the absence of fullest evidence, courts are reluctant to pass upon questions which go to

the very root of the litigation. It is only necessary to say in the present posture of this case that the answer does not allege directly, but only by inference, that the contract by which the traction company succeeded to the rights of Massey Wilson and associates, and built its lines through Capitol Heights into the park, would not have been made, but upon the faith of statements made by officers of the amusement company when the entry of the traction company was under discussion. Whatever view is taken of the affidavits, which are in material conflict in other respects, it is clear that no definite conclusion or agreement was reached as to any particular thing. The sale of the property of the amusement company, the keeping up of a place of amusement by the traction company at Pickett Springs, and other things, were discussed. It seems that any agreement as to any entry into the park was dependent upon the legal rights of the amusement company, as it might be advised by counsel. When the last meeting broke up, defendant was informed that complainant could make no legal agreement, and insisted upon an indemnifying bond, etc. Certainly no agreement whatever was reached as to the location of tracks at any particular place on the leased grounds, or as to the reasonableness of the entry atcually made. The whole evidence, however, leaves upon the mind the impression that the officers of the traction company were led to believe that no bona fide resistance or objection was intended or would be made by the amusement company to any reasonable entry the traction company might make into the leased grounds. This feature relieves the defendant of the character of a wanton and high handed invader of the premises, certainly as to a large part of the property taken, and undermines much of the force of the earnest argument of complainant's counsel that a court of equity ought not to permit the retention, under the circumstances of this case, of a possession acquired by force and a high hand. If an entry and occupation be lawful when properly made, and become unlawful only because the entry is by force at the hands of one from whom the possession is wrongfully withheld, a court of equity, in the absence of circumstances of irreparable injury from the mode of entry and occupation, will not, by the use of its extraordinary powers, protect the possession in favor of one who wrongfully sought to withhold it, but will leave such a complainant to redress the forcible trespass upon his possession by the ordinary civil and criminal remedies. The facts as now presented not making out an estoppel, it is necessary to consider the rights of the parties on the merits.

2. Power Reserved Not Exhausted. It is objected that the power reserved in the lease to grant a right of way for street railway purposes had been exhausted before Walker and wife made the deed to the traction company, because Walker and wife acquiesced in and consented to the prior entry into the park of the Montgomery Street Railway Company, and its use of a part of the premises as a station for receiving and delivering of passengers. The value of the leased premises to Ayers, to whose rights the street railway company succeeded, with the assent of the lessor, and the ability of the

lessees to make a profit out of the enterprise, depended upon the patronage secured by the park. The number of customers would be fixed by the cheapness, comfort, and speed of travel to and from the city of Montgomery, whose population was the only source from which it was contemplated the patrons of the park would be drawn. The means by which persons could be landed within the grounds was therefore a matter of prime importance to the lessees. The lease and the purposes for which it was made, and the circumstances under which it was made, inevitably vested in the lessee and his assigns, during the life of the lease, wide discretion to determine for themselves how this vital want of the park should best be met. The lessees had the right, so long as they exercised it without permanent injury to the freehold, to solicit and permit the entrance into the park of any vehicle which brought customers into it. They had the same right to admit a street car as they had to admit carriages. They had the same right to permit the construction of a roadbed into the park for a street railway as they had to make driveways for automobiles and vehicles drawn by horse power. The lessors could not have defeated the exercise of this right if they had objected, provided the power was exercised in such a manner as not to permanently injure the freehold. The entry of the street railway into the park is not challenged on that ground. The assent of the Walkers to an entry of a street railway into the park, not made at their instance, and which they could not prevent, cannot work a forfeiture of the right reserved by them. The act here relied on gives no proof of any intent to abandon the right, and furnishes no basis for an estoppel.

3. Railway within Contemplated Class. It is urged that the railway of the traction company does not fall within the class of street railways the parties contemplated. Street railways superseded stagecoaches, omnibus lines, and, in large measure, hacks, in carrying passengers to and from points in cities and towns and to suburban places. They went originally only to points reached by public highways. The public convenience and safety alike demanded that the grade of such highways should not be altered to meet the needs of a new method of conveyance which used these highways jointly with travelers by other modes. They did not need to go upon private property. The law did not contemplate that they should. Besides, the value of private property adjacent to these highways practically forbade its acquisition, if the law had permitted it, for use as a right of way. Being thus limited in their sphere of operation and powers, the term "street railway," in legal and popular acceptation, at first included only surface roads built upon streets and public highways for the carriage of passengers in and about cities and towns and adjacent suburban places. Under the influence of changed conditions of population and social life, these surface roads on the streets and highways began to serve the wants of the people in places not in any city or town, but in the vicinity thereof, and sometimes reached out to places not upon any public highway. The Legislature of this state, recognizing the usefulness of street railways, and the changed conditions which had

grown up, conferred upon them larger discretion as to their termini, and gave them in some instances the power to condemn private property for rights of way to reach their termini. So in this state, at least, the meaning of the phrase "street railway" gradually broadened until it included not only surface roads for passengers on streets and highways, but also what are now known as "trolley lines," which reach out from cities to the adjoining country, and frequently run off the public roads—a policy the public authorities now encourage—in order to reach points in the vicinity of cities and towns, though outside of their boundaries, and off the public highways, wherever passenger traffic encourages street railway service. At the time this lease was entered into, a street railway of this kind, the predecessor of the present street railway company, had operated for some time the first practical electric street railway of any length on this continent, if not in the world. One of its termini ended in a park it bought, outside of the city limits, and ended within about a mile of the leased premises. Clearly, in view of the surounding circumstances, it was of the class of street railways, if not the very railway, which the parties contemplated might enter the park when the power was reserved to grant rights of way for "street railway purposes."

4. Act of March 20, 1903, Constitutional. It is insisted that the charter of the traction company gives it no power to operate its road to or within the park at Bloemfontaine. Its original charter gave it no such authority. If it possesses it now, it must be by virtue of certain proceedings to enlarge its powers under the act of March 20, 1903 (Acts 1903, p. 116), to amend section 1283 of the Code of Alabama. It is argued that the proceedings are invalid because they do not conform to that act. It suffices to say of this objection that while the particulars wherein the proceedings are criticized might possibly invalidate them as an exercise of corporate power on direct attack by the state, the court is of opinion they must be held, on collateral attack, to grant the requisite authority. We pass to the graver objection that the statute itself is invalid. Section 45 of the Constitution of Alabama ordains, "the style of laws of this state shall be, 'Be it enacted by the Legislature of Alabama.' " Complainant correctly urges that this section is mandatory, and not directory; that no equivalent words will suffice; and that any departure from the mode prescribed is fatal to the enactment, since, if one departure in style, however slight, is permitted, another must be, and the constitutional policy embodied in the section would soon become without any force whatever. In support of complainant's view, and in proof of its approval by the legislative and executive departments of Alabama, the attention of the court is directed to a message of the Governor returning a bill without his approval because it omitted from the enacting clause the words "of Alabama." At that time the Constitution declared, "The style of the laws of this state shall be 'Be it enacted by the General Assembly of Alabama.' " In consequence of the omission of the words "of Alabama" in the enacting clause in that bill, the Governor's veto was unanimously sustained. Senate Journal 1890–91, pp. 299–302.

The writer of this opinion was the author of that message, and sees no reason, on reflection, to doubt the soundness of its views.   In that case, however, there was a failure to use all the words prescribed by the Constitution.   The enacting clause of the bill stated it was enacted by the "General Assembly."   What General Assembly?   The Constitution was mandatory that the clause state that the statute was passed by the "General Assembly of Alabama."   In Nevada v. Rogers, 10 Nev. 254, 21 Am. Rep. 738—a leading case —the enactment was adjudged void because the Constitution declared the style of laws shall be "The people of Nevada, represented in Senate and Assembly, do enact," and the enacting clause omitted the words "in Senate and."   There, again, was a failure to use the words prescribed by the Constitution.   So, too, in May v. Rice, 91 Ind. 546, where the Constitution required the style of the enacting clause to be, "Be it enacted by the General Assembly," and the act omitted the words "by the General Assembly."   In the case now in hand there is neither an insufficient statement of the authority which enacts the law, nor is there a failure to use the identical words prescribed by the Constitution for the style of laws.   This statute explicitly states that it is enacted by "the Legislature of Alabama."   The only fault is that the enacting clause goes further than the Constitution commands, and declares that "the Legislature of Alabama" which enacted the statute is "the Legislature of the state of Alabama."   That, however, is but a statement of a legal fact and consequence which the Constitution itself inevitably reads into every act.   On the faith of the authority this statute is supposed to confer, enterprises have been undertaken, contracts made, and public and private rights have been affected.   In the absence of any controlling decision by the Supreme Court of Alabama, whose rulings are binding here as to matters of this kind, this court will not hold that a statute is invalid, under this clause of the Constitution of Alabama, where the enacting clause uses the identical words prescribed by the Constitution for the style of laws, although there be incorporated in the enacting clause superfluous words, when the only possible office or effect of the superfluous words is to state a constitutional and legal fact, which every court is bound judicially to declare is true of every law enacted "by the Legislature of Alabama."

5. Amendment of Charter Valid.   It is next insisted that the proceedings had under the act of March 20, 1903, are void, because that act had been repealed by the act "to confer and limit the powers of business corporations, and to provide for their organization and regulation," approved October 2, 1903 (Acts 1903, p. 310), the forty-seventh section (page 336) of which, it is alleged, provides only the legal mode by which the alteration and amendment of the charter of the Traction Company could be had.   That company was in existence prior to the passage of that act, and had authority under the act amending section 1283 of the Code, approved March 20, 1903 (Acts 1903, p. 116), and perhaps under the act amending section 1189 of the Code, approved October 1, 1903 (Acts 1903, p. 384), to make alterations in its charter, and to change its

lines and their termini. The last, and therefore controlling, words of the act of October 2, 1903, commonly known as the "New Jersey Act," are "that nothing in this act shall be so construed as to add to, take from, or otherwise affect the rights, powers, duties and liabilities of any corporation now existing, chartered under the laws special or general of this state," etc. It is strenuously insisted that section 47 has no further office and effect than to regulate the mere mode by which a particular corporate right or power, which the section leaves untouched, shall be exercised in the future, and that it does not in any just sense affect or change the "rights" and "powers" of the corporation, and therefore section 47 should be allowed full play and operation against the saving clause, whose only object is to prevent the act's affecting a change of corporate "powers" or "rights" in the case of a pre-existing corporation. We are not here concerned with any vested right of any corporation to avail itself of any particular mode of manifesting its election to exercise any privilege the laws give it. Besides, the reservation as to charters in the Constitution permits the exercise of such power by the Legislature. The only question is, what has the Legislature done? The prior law, authorizing corporations to alter or amend their charters, entered into and formed part of the powers of every corporation organized under the general law. These statutes conferring the right upon corporations to alter their powers and enlarge the scope of their enterprises delegate a function which the sovereign usually reserves to himself, and can never be exercised by a corporation, except by the express sanction of the authority which creates that corporation. The right or power to do such a thing is inevitably, in the very nature of things, a high corporate right or power. Under the former law the existing corporation had the power or right to alter and change its charter and enlarge its powers in the modes the law then provided. The powers thus given by the state continue in being until repealed or withdrawn. How can the power be repealed or withdrawn by an act which expressly declares that nothing in it shall "add to, take from, or otherwise affect" the rights and powers of existing corporations? If we hold that the act approved October 2, 1903, withdraws or changes the right or power then residing in the corporation itself to enlarge corporate powers, we inevitably hold that the statute does "take from, or otherwise affect," the right existing prior to its passage—the very thing the act says it does not intend to do. Corporations existing under prior laws had the right, notwithstanding the passage of this law, to exercise any power they then possessed, in the modes prescribed by the then existing law. The objection that the proceedings here were taken under the wrong law must therefore fail.

6. Traction Company had Capacity to Hold Right of Way. It is insisted, as the park grounds are a mere private place of amusement, to which the general public are not invited, and are maintained only for a part of the community, whose invitation may be withdrawn at any time, that a street railway, which is under obligation to carry all persons impartially, has no power to build a street railway into the park for the transportation of such persons only as

the park receives, and that it has no power to hold by contract, where it cannot condemn, a right of way over private property, especially for such restricted service. The deed to the right of way imposed no conditions which confine its use to transporting any particular class of persons. Whatever may be the anomaly of a town which has never been platted, and is wholly without streets, and whose entire territorial limits have, by the act of the proprietors of the soil, been surrendered to the possession of a private corporation engaged in a wholly private business, the fact remains, in law, that the territory is in a town. · It is therefore one of the places which under the law may be made a terminus of a street railway. Building and operating a street railway into such a terminus is clearly authorized by our incorporation laws, and cannot be ultra vires. Conceding that a street railway has no power to condemn a right of way over property in a town, nor, under any circumstances, for the carriage only of a particular class of persons, it does not follow that a street railway may not lawfully hold or acquire a right of way on private property in a town by purchase or lease from the owners. Property so held is used for a corporate purpose, and the corporation has undoubted capacity to take and hold it. When the owner of private property grants a right of way in such a place, he cannot challenge the capacity of the corporation to hold it, which then becomes a matter wholly between the corporation and its creator. One who merely succeeds to the rights and stands in the shoes of the former proprietors, who had sold the right of way, is not in position to challenge the right to hold the property. While the main motive in buying the right of way and building the street railway into the park may have been to transport such passengers as are received into the park, there is no legal disability to hold a deed to operate the line into the park as a common carrier for the accommodation of the public generally. Whether passengers other than those invited into the park may, in view of the circumstances of this grant, go off of the right of way when carried in, and enter upon the leased premises, without the consent of its managers, is another question, as to which no opinion is now intimated. It is mentioned here only to show that the traction company may lawfully operate a street railway into the town, and that from the lawful use of the right of way this court has no power to restrain it, though perhaps it might do so if the traction company abuses the grant by using it only for a private purpose, to the special injury of a particular person legally damnified thereby. We are not concerned here with the exercise of the power of eminent domain. The entry is upon private property in a town under contract with its owner. The purchase of private property in cities and towns for a corporate purpose, although it could not be taken by condemnation at such places, is an everyday occurrence, and falls neither within the spirit nor the letter of the rule which forbids corporations exercising any power not expressly given or necessarily implied.

7. Construction of Reservation. What was in the minds of the parties when they provided, "Nothing in this lease shall be so con-

strued as to prevent the parties of the first part [the Walkers] from granting a right of way by deed or lease through any part of said leased premises, for street railway purposes"? How far was it contemplated that the exercise of that right should interfere with the uses for which the lease of the lands was made, and the right of the lessees to control them and regulate the business to be carried on upon the leased premises? The right reserved was one which might or might not be exercised. If availed of, it might be exercised at any time during the life of the lease. In arriving at a true construction of the intent of the parties, when the words themselves, taken in connection with the context, do not unalterably fix them, we must look to the surrounding circumstances and the prime objects the parties had in mind. The purpose of the lessors was to surrender possession and control of the lands for a park and place of amusement, to be managed and controlled exclusively by the lessees for their own profit, so long as the leased premises were not devoted to any other use, and the lessees paid the stipulated rent, for a period of 20 years. The only right reserved by the lessors was to enter the lands to remove certain kinds of timber, and to re-enter if the rent was not paid, and the right to grant rights of way for street railway purposes through any part of the leased premises. These respective rights were to be exercised during the period of 20 years, during which the exigencies of the business and changed conditions would create situations which would materially shape and determine the respective rights of the parties. The lessees could not arbitrarily say to the lessors: "We need this entire body of lands. You shall not grant a right of way over any of them." The lessors could not arbitrarily say to the lessees: "We reserved the right to run a street railway anywhere over the grounds. You must move your buildings and disarrange your park, no matter what the damage to you, because we have a right to locate a right of way as we please." The power to locate the right of way must take the channels of least injury to both parties at the time it is sought to exercise the power. So long as the leased lands are not actually so used that a location for a street railway would require the amusement company to remove its buildings and structures, or disarrange them and the adjacent ground, or deprive it of proper control and economical management of the lands occupied for a park and place of amusement, the amusement company has no right to object to the location of a right of way through any part of the leased lands. If the reservation here was of a right to allow another amusement company to enter upon the lands to carry on the same kind of business, it is clear that such a reservation, being restrictive of the purposes of the grant, would be defeated if the entire premises were so occupied that to allow the subsequent use would impair or destroy the rights of the first occupant. Whether or not the terms of the reservation import a different intent here, it is needless to inquire, since the facts of the case take it without the operation of the principle. Here a large part of the premises is not needed or used for a park or place of amusement. The plan upon which the park and buildings in it are arranged is such that

the location of a street railway through the greater part of the premises cannot interfere with the park, and is in no sense even obstructive of the purposes of the lease. The bringing of a new line of transportation near the park, or even within it, if the entry is made in a suitable way, is an advantage, not a disadvantage, to a private place of amusement conducted for gain. If those interested in the execution of a power like this cannot agree upon a reasonable location, a court of equity has the undoubted authority to intervene to properly regulate and control the exercise of the power, and the rights of the parties arising thereunder.

8. Surrounding Circumstances. At the time this lease was made, only one system of street railway was in operation about the city. One of its termini ended within a mile of the park of Bloemfontaine. The building of another line of street railway from the city of Montgomery to Pickett Springs was then being discussed, and Pickett Springs was incorporated at the same session of the Legislature as Bloemfontaine, with a view to the maintenance of a place of amusement in connection with the street railway to Pickett Springs. That place is about 4½ miles from the city of Montgomery, and north of it, and about 3 miles from Bloemfontaine. Topographical conditions between the nearest terminus of the Montgomery Street Railway and the park are such that its extension to the lands of the Walkers, which lay beyond the park, would naturally take the route through the leased lands. Putting one's self as far as possible in the position of the parties at the time, in view of the surrounding circumstances, the first thought, naturally, is that the Walkers reserved the right, to prevent the lessees of the park, by means of their control of this particular body of land, from throwing obstacles in the way of any street railway which might desire to come from the city of Montgomery through the leased lands to other property of the Walkers. Obviously the lessee was interested in having the park reached by street railways, and most concerned with street railways which only stopped therein. It is not probable that the Walkers thought the lessees would keep any street railway from coming to and stopping in the park, and, in anticipation of such an attitude, reserved the power to put a street railway into the park. The buildings put upon the premises were to revert to the Walkers at the expiration of the lease, and the value of them at that time would depend largely upon the prosperity of the business of the park. It may be that the Walkers reserved the right to grant a right of way for a street railway, in order to prevent the crippling of the park by its dependency on one street railway in the event, after getting in, it so managed its business as to retard the growth of the park. It may be, also, that they thought the right to allow a street railway to enter the park, where a large passenger business would probably be built up, would be valuable as a property right, which might be sold by them, or be influential in inducing some other road to come through other lands of the Walkers in order to reach the park. These and other considerations might have been in the contemplation of the parties at the time. If the court should hold that the reserved power was intended to apply only to

rights of way for a street railway, which needed to go "through" the park in order to reach some outside point, it would add a limitation upon the power which the parties themselves have not expressed, and which the surrounding circumstances do not create. The conclusion that the Walkers did not anticipate changed conditions, and had in mind only a railway which would need to go through the lands in order to reach some other point, would be based upon the veriest conjecture. The fact is, as appears from the state of things to-day, that the exercise of the power the Walkers reserved finally enabled them to induce a railway from the city of Montgomery to come upon other lands of the Walkers, adjacent to the leased lands, in order to enter Bloemfontaine. It is not permissible for the court to strike down rights which the words of the contract include, and which the surrounding circumstances do not exclude, upon the supposition that the parties were not in fact sufficiently farseeing to anticipate the particular use or advantage which might happen in the future by the lawful exercise of the reserved power. The Walkers having reserved a power, the exercise of which might bring them this advantage, it is not for the court, when conditions have enabled them to realize the advantage, to take it away on the theory or conjecture that the Walkers did not foresee what has now happened, and had other purposes in view.

9. Amusement Company has Rights of Its Own. It is strenuously urged by the defendant that the street railway company is using the amusement company to uphold its rights in a contest with another transportation company—a matter in which the public is interested. However that may be, the amusement company has rights as to the management and control of the property in its possession. When its property has been invaded, it is its right, under the Constitution and laws, to insist upon those rights, and the court cannot deny them recognition because the effect of their enforcement might result in advantage to some one else, or disappoint some public expectation. The bill and affidavits show that the street railway company has made large advances to the complainant, and with the desire "to encourage passage to the park for the purposes of revenue from street car fares," and that the contract between the two companies bound the amusement company "to encourage in every reasonable way travel" over the lines of the street railway during the continuance of the lease. Good faith on the part of the amusement company demanded at least that it should not be a party to a selection and use of a place inside of the park which would give a rival company, which had not participated in the responsibilities and expenses of the park, a favored location inside the park, to carry off passengers whose coming there was one of the chief reasons which induced the contract between the amusement company and the street railway company. It is needless to say that the street railway is not a party, and its rights are not before the court. Its only duty in the premises now is to declare the rights of the parties before it, as the law determines and fixes them.

10. Route Arbitrarily Located into the Park Inclosure.   Judging from the map and a personal inspection of the locus in quo, it does not seem to the court that the route selected by the traction company, after leaving the Mt. Meigs Road, and entering the park property by the lower end of the lake, and then running almost at right angles into the park property, is an arbitrary or improper location, or at all destructive of the purposes of the grant or the business of complainant.   Such a route, in its initial stages, is far better for all concerned than crossing the lake further up by trestle, or entering upon the park property at the head of the lake.   When, however, the location, after running some distance on the unfenced portion of the park, puts a 30-foot right of way into the inclosure of the park itself, where complainant has laid off the ground, improved it, and it is studded with buildings, taking a line which skirts close to these buildings, and between them and the lake, it is an arbitrary and unreasonable exercise of the reserved power, which a court of equity will restrain.   The constant running of street cars by electricity in such a place in the park, between the main grounds and the lake, and near the main ingress and egress to buildings and places of amusement, would seriously interfere with the management by the amusement company of its business, and would endanger, at least, old persons and young children in the crowds which roam about the park, in going to and from the lake.   The reservation of the power to grant rights of way was never intended to give the lessors power to inflict such injury upon the lessee, or to enable the lessors or their assigns to disarrange and disorder the lessees' control of their own premises and business. The right of the amusement company to control its internal affairs, inside of the grounds, actually occupied and used by it for park purposes, is a valuable property right, which is not left to the control of the lessors, and a court of equity must protect it.   The damage which would be inflicted upon the lessee by bringing such a state of things to pass, and the running of cars on the route selected inside of the fenced portion of the park, would certainly amount to far more than $2,000, exclusive of costs and interest, during the years of the life of the present lease.   The objection on the ground that the amount involved is insufficient to give jurisdiction is therefore overruled.

Whatever may be the law in other cases, the court is of opinion, under the circumstances of this case—where the right of way was neither defined nor outlined, and might be located at any future time, upon the possession of one to whom the premises are leased for a particular business, which necessitates the erection of buildings and improvement of the grounds—that one who locates the right of way so as to disarrange the complainant's business, and avails himself of complainant's improvement for his own benefit, at least when another route is equally feasible and convenient, must pay fair compensation for the value of such taking and use during the term of the lease.   The driveway from the Mt. Meigs Road to the park, so far as it has been utilized for defendant's roadbed, falls within this principle.

Injunction Allowed. A preliminary injunction will issue against any use by the defendant of the right of way within the inclosure, as set forth in the map made an exhibit to the amended bill, and within 50 feet of the point where the defendant entered the complainant's fence; but, in view of the circumstances under which the entry was made, the complainant must allow defendant, if it so desires, to remove the iron and structures within the enclosed park, and within 50 feet of the entrance thereof, the defendant, in turn, putting the premises in the same condition, after removing the track, as they were before it was built thereon.